# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ALASKA

In re:

MARCUS LOYD KING,

        Debtor.

Case No. A10-00505-DMD

Chapter 13

**Filed On
10/25/10**

## MEMORANDUM REGARDING CLAIM OBJECTION
## [Claim No. 3]

        The debtor's objection to Claim No. 3 filed by his former spouse, Angel King, duly came before the court for hearing on September 21, 2010. I find the objection to be without merit. It will be overruled.

Case Background

        The debtor, Marcus King, is a union journeyman/utility man who works for the Municipality of Anchorage at the Anchorage Water and Wastewater Utility. Angel King is a veterinary technician with the Hillside Pet Clinic. They had a brief marriage which ended in divorce.

        The Kings were married on March 24, 2006. It was not the first marriage for either party. Marcus had two sons from a prior marriage, and pays child support for them to his first ex-wife. Angel had custody of a son from her first marriage. Her son continued to reside with her during her marriage to Marcus.

The couple lived in Angel's house during their time together. They apparently separated in December of 2007. No children were born of the marriage. A complaint for divorce was filed by Angel in 2008.[1] The state court entered a decree of divorce on January 12, 2009,[2] and held subsequent proceedings on property settlement and other issues.

Despite a substantial income, Marcus King had financial troubles when he married Angel. He was deeply in debt with credit cards. Angel owed some money on her pick-up truck. On September 13, 2006, the couple took out a second mortgage on Angel's house to pay off their short-term debt. The loan was for $50,000.00, with interest accruing at the rate of 7.75%.[3] It was for a term of 20 years, with monthly payments of $410.48. About $35,000.00 of the loan was used to pay off the debtor's credit card debt, and $15,000.00 to pay the balance owing on Angel's truck. Anticipating the worst, Angel had Marcus sign a contract prior to the closing. In it, Marcus agreed that if the marriage should dissolve, he would assume the entire remaining balance of the mortgage loan at the time of separation.[4]

The divorce was contested. Angel represented herself. At the conclusion of an evidentiary hearing regarding "property issues" held on September 29, 2009, Superior

---

[1] *King v. King,* Case No. 3AN-08-11507 CI, in the Superior Court for the State of Alaska, Third Judicial District.

[2] Docket information from Case No. 3AN-08-11507 CI, found on the State of Alaska's CourtView Search site, http://www.courtrecords.alaska.gov/.

[3] Debtor's Ex. B (Fed. Truth In Lending Disclosure Statement).

[4] Angel King's Obj. to Confirmation of Plan, filed Aug. 12, 2010 (Docket No. 22), Ex. A.

2

Court Judge John Suddock entered oral findings and conclusions. After further proceedings, Judge Suddock issued supplemental written "Findings of Fact and Conclusions of Law Regarding Property Division," on May 10, 2010.[5] Judge Suddock noted that he had previously ordered Marcus to pay 65% of the second mortgage, and found that the present value needed to pay this share of the obligation was $43,419.00. He acknowledged that Marcus King had faced health problems in the past but was working again. Judge Suddock also stated:

> 4. The second mortgage has put Ms. King at substantial risk of loss of her home. She struggles to pay the first and second mortgages, and is falling behind. She needs payments from Mr. King on a monthly basis if she is to retain the home.
>
> 5. Mr. King is effectively judgment-proof in the short term, other than his paycheck. He has children by one or more prior marriages to support. It is uncertain whether he will be able to maintain his municipal job.
>
> 6. Ms. King seeks a judgment that provides a mechanism to garnishee Mr. King's wages, but that provides for imposition of a qualified domestic relations order against the pension in the event that execution on a money judgment proves unsatisfactory.
>
> 7. The court finds that in these unusual circumstances, the retention of continuing jurisdiction to enter a qualifying domestic relations order in the event collection efforts

---

[5] Debtor's Notice of Hr'g on Obj. to Proof of Claim #3, filed Aug. 13, 2010 (Docket No. 24), Ex. A.

3

> prove unsuccessful is the only way to grant Ms. King appropriate and reliable relief which maximizes her chances of retaining her home.
>
> 8. Accordingly, the court orders Mr. King not to impair, borrow from, hypothecate or draw upon any pension benefits without leave of court and further order. No benefits from the State of Alaska PERS plan shall be paid, issued or otherwise disbursed to Marcus L. King . . . until order of this court. Ms. King should provide the PERS administrator with a copy of this order.
>
> 9. The court will hold an annual status review of this matter during the first week of January of each year. The initial hearing will be held on Wednesday January 5, 2011, at 4:00 P.M. The purpose of the hearing is to determine whether collection efforts are proceeding successfully, or whether the court should vacate its judgment and enter a qualifying domestic relations order, in light of the then existing circumstances.[6]

Angel was awarded a judgment of $43,419.00 against Marcus on May 14, 2010.[7] She attempted to execute on the judgment on June 11, 2010, by garnishing his wages. The employer's response to Angel's writ, dated June 17, 2010, indicated that Marcus's earnings were already subject to a prior garnishment, in the amount of $74.80 weekly, and that $159.36 was available for garnishment each week under Angel's writ.[8] Marcus filed his chapter 13 petition the same day his employer returned Angel's writ. His statement of

---

[6] *Id.*, Ex. A at 2-3. Mr. King's birth date and social security number have been excluded to protect his privacy.

[7] Angel King's Obj. to Confirmation (Docket No. 22), Ex. D.

[8] *Id.*, Ex. E.

4

financial affairs indicates that he transferred assets with substantial value to his father within the year prior to the date his petition was filed.[9]

Angel King filed Claim No. 3 on July 1, 2010. The claim is for the sum of $43,531.41. The proof of claim form indicates that Angel is a secured creditor by virtue of the second mortgage on her home, but also indicates that she holds a priority claim under 11 U.S.C. § 507(a). The claim form doesn't specify which subsection of § 507(a) applies to her claim. Angel also filed an objection to confirmation of Marcus's chapter 13 plan on August 12, 2010. She argues that Marcus has filed his chapter 13 petition in bad faith.

Marcus filed his objection to Angel's claim on August 13, 2010. He says Angel's claim is clearly one for property settlement, which should be allowed as a general unsecured claim. Under Marcus's pending chapter 13 plan, the anticipated distribution to general unsecured creditors is 4.7%.

---

[9] For example, the Statement of Financial Affairs indicates that the debtor received $12,200.00 in 2010 from an Exxon EVOS Litigation claim, and that this same amount was paid to his father in January, 2010. *See* Statement of Financial Affairs, filed Jun. 17, 2010 (Docket No. 1), ¶ 2 and 3.c. Claim No. 6, filed by Marcus's father, indicates he received more than this – $16,548.00 – from Marcus in 2010. Paragraph 6.b. of Marcus's Statement of Financial Affairs indicates that he assigned his Exxon claim, his present and future retirement funds and his 2006 Chevrolet to his father in September and November of 2009. These assignments and transfers might be voidable on a variety of grounds. Transfer of the Exxon claim and other funds to the father could be a preference or fraudulent transfer under 11 U.S.C. §§ 547 and 548, voidable by a chapter 7 trustee. Because the transfer was to an insider of the debtor, a chapter 7 trustee would have a longer "reach back" period to recover a preference. 11 U.S.C. §§ 101(31)(A), 547(b)(4)(B). Transfer of the retirement funds may be voidable by a chapter 7 trustee under the strong arm clause, 11 U.S.C. § 544(b)(1). The debtor's attempted assignment of the retirement funds could also be invalid under ERISA. Further, he may have failed to "perfect" some of the assignments by giving notice to the obligors on the underlying debts. While transfer of the truck might also be a fraudulent transfer or preference, the schedules indicate the debtor has no equity in the vehicle.

5

Discussion

A chapter 13 plan must provide for full payment of all claims entitled to priority under 11 U.S.C. § 507.[10] Domestic support obligations receive first priority under § 507(a)(1). Such obligations are defined in 11 U.S.C. § 101(14A), which provides:

> (14A) The term "domestic support obligation" means a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is –
>
> (A) owed to or recoverable by –
>
> (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
>
> (ii) a governmental unit;
>
> (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;
>
> (C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of –
>
> (i) a separation agreement, divorce decree, or property settlement agreement;

---

[10] 11 U.S.C. § 1322(a)(2).

6

>        (ii)  an order of a court of record; or
>
>        (iii)  a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and
>
>    (D)  not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.[11]

The issue here is whether the obligation Marcus owes to Angel is "in the nature of alimony, maintenance or support . . . without regard to whether such debt is expressly so designated."[12] All of the other requirements of § 101(14A) are met. The debt to Angel arose before the order for relief. Angel is the debtor's former spouse and the debt was established by an order of a court of record.

Marcus argues that his debt to Angel is "conclusively" a property settlement because the state court entered findings of fact and conclusions of law regarding "property division."[13] However, the Ninth Circuit held long ago that a bankruptcy court is not bound by the state court's treatment of a divorce obligation when determining whether a debt is in the nature of support.[14] Instead, this determination is governed by federal bankruptcy law,

---

[11] 11 U.S.C. § 101(14A).

[12] 11 U.S.C. § 101(14A)(B).

[13] Debtor's Notice of Hr'g on Obj. to Proof of Claim No. 3 (Docket No. 24), at 3.

[14] *Shaver v. Shaver*, 736 F.2d 1314, 1316 (9th Cir. 1984).

looking to the substance of the debt rather than the label it has been given.[15] Subsection 101(14A), which was added to the Bankruptcy Code under BAPCPA,[16] has codified this standard. A domestic support obligation is a debt that is "in the nature of alimony, maintenance, or support . . . without regard to whether such debt is expressly so designated."[17]

In *Shaver*, the Ninth Circuit discussed the factors to be considered in determining whether an obligation is one for property settlement or support:

> [T]he court must look beyond the language of the decree to the intent of the parties and to the substance of the obligation . . . If an agreement fails to provide explicitly for spousal support, a court may presume that a so-called "property settlement" is intended for support when the circumstances of the case indicate that the recipient spouse needs support. Factors indicating that support is necessary include the presence of minor children and an imbalance in the relative income of the parties. Similarly, if an obligation terminates on the death or remarriage of the recipient spouse, a court may be inclined to classify the agreement as one for support . . . Support payments tend to mirror the recipient spouse's need for support. Thus, such payments are generally made directly to the recipient spouse

---

[15] *Id.*

[16] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. No. 109-8, 119 Stat. 23 (April 20, 2005), became effective on October 17, 2005. BAPCPA not only added the definition for a "domestic support obligation" to the Bankruptcy Code, it also elevated such obligations from seventh to first priority under 11 U.S.C. § 507(a).

[17] 11 U.S.C. § 101(14A)(B).

and are paid in installments over a substantial period of time.[18]

In a subsequent decision by the Ninth Circuit BAP, *Leppaluoto v. Combs*,[19] the court stated:

> In order to determine whether a debt is a nondischargeable spousal support obligation or a dischargeable property settlement, the court must ascertain the intention of the parties at the time they entered into their stipulation agreement, and not the current circumstances of the parties. The court should look to the substance of the obligation in the agreement, and generally should disregard labels and titles. If the provision's intended function is to provide a necessity of life, it is ordinarily held to be nondischargeable maintenance support.
>
> . . . .
>
> Bankruptcy courts have employed various factors to determine the intent of the parties of an ambiguous divorce decree. Some of the factors include:
>
> 1. The label given to the payments;
>
> 2. The context or location of the disputed provision in the decree;
>
> 3. The parties' negotiations and understanding of the provision;
>
> 4. Whether a lump sum or periodic monthly payments were provided for;

---

[18] *Shaver*, 736 F.2d at 1316-17 (citations omitted).

[19] *Leppaluoto v. Combs* (*In re Combs*), 101 B.R. 609 (B.A.P. 9th Cir. 1989).

9

      5. The relative earning power of the parties;

      6. Whether the recipient spouse would be entitled to alimony under state law;

      7. Whether interest accrues on the entire debt or only on the monthly payments past due; and

      8. Whether the debtor's obligation of payment terminates on the death or remarriage of the recipient, or on the death of the debtor.[20]

I applied the *Combs* factors to mortgage payments in *Palmatier v. Palmatier*.[21] In that case, a provision requiring the former husband to pay $900.00 per month to his former wife for a mortgage on the family home was located in a section of a child custody, child support and property settlement agreement that dealt with division of property. After applying the *Combs* factors, I concluded that the mortgage payment provision constituted maintenance and support for the wife and children of the debtor. I also stated, "[s]helter is a necessity of life. Assistance in the provision of shelter is support or maintenance."[22] A majority of federal courts considering this issue have reached the same conclusion, finding that mortgage payments which may have been labeled as a property settlement in an

---

[20] *Combs*, 101 B.R. at 615-16 (citations omitted).

[21] *Palmatier v. Palmatier (In re Palmatier),* 1 A.B.R. 155 (Bankr. D. Alaska 1990).

[22] *Palmatier*, 1 A.B.R. at 161.

10

agreement or decree nonetheless constitute maintenance or support under federal bankruptcy law.[23] A minority of courts have found otherwise, on facts distinguishable from this case.[24]

Applying the Ninth Circuit factors found in *Shaver* and *Combs* to evaluate the state court's findings and conclusions in the Kings' divorce leads to inconsistent results in this case. Under *Shaver*, the court is to consider "the presence" of minor children and an

---

[23] *Robinson v. Robinson (In re Robinson)*, 921 F.2d 252 (10th Cir. 1990); *Gianakas v. Gianakas (In re Gianakas)*, 917 F.2d 759 (3rd Cir. 1990); *Yeates v Yeates (In re Yeates)*, 807 F.2d 874 (10th Cir. 1986); *Hughes v. Hughes (In re Hughes)*, 164 B.R. 923 (E.D. Va. 1994); *Rush v. Rush (In re Rush)*, 100 B.R. 55 (D. Kan. 1989); *Galpin v. Galpin (In re Galpin)*, 66 B.R. 127 (N.D. Ga. 1985); *Busch v. Hancock (In re Busch)*, 369 B.R. 614 (B.A.P. 10th Cir. 2007); *Tatge v. Tatge (In re Tatge)*, 212 B.R. 604 (B.A.P. 8th Cir. 1997); *Durrance v. Durrance (In re Durrance)*, 357 B.R. 673 (Bankr. M.D. Ga. 2005); *Lewis v. Trump (In re Trump)*, 309 B.R. 585 (Bankr. D. Kan. 2004); *Stahl v. Stahl (In re Stahl)*, 261 B.R. 164 (Bankr. W.D. Pa. 2001); *Martinez v. Martinez (In re Martinez)*, 230 B.R. 314 (Bankr. W.D. Tex. 1999); *Smith v. Smith (In re Smith)*, 218 B.R. 254 (Bankr. S.D. Ga. 1997); *Kubik v. Kubik (In re Kubik)*, 215 B.R. 595 (Bankr. D.N.D. 1997); *Smith v. Edwards (In re Smith)*, 207 B.R. 289 (Bankr. M.D. Fla. 1997); *Byrom v. Spencer (In re Spencer)*, 207 B.R. 233 (Bankr. E.D. Okla. 1997); *Montgomery v. Montgomery (In re Montgomery)*, 169 B.R. 442 (Bankr. M.D. Fla. 1994); *Burns v. Burns (In re Burns)*, 186 B.R. 637 (Bankr. D.S.C. 1992); *Cummings v. Cummings (In re Cummings)*, 147 B.R. 747 (Bankr. D.S.D. 1992); *Karpinski v. Karpinski (In re Karpinski)*, 144 B.R. 356 (Bankr. E.D. Mich. 1992); *Hill v. Hale (In re Hill)*, 133 B.R. 126 (Bankr. N.D. Ind. 1989); *Borzillo v. Borzillo (In re Borzillo)*, 130 B.R. 438 (Bankr. E.D. Pa. 1991); *Yauger v. Yauger (In re Yauger)*, 130 B.R. 25 (Bankr. W.D. Pa. 1991); *Altchek v. Altchek (In re Altchek)*, 124 B.R. 944 (Bankr. S.D.N.Y. 1991); *Wheeler v. Wheeler (In re Wheeler)*, 122 B.R. 645 (Bankr. D.R.I. 1991); *Youngman v. Youngman (In re Youngman)*, 122 B.R. 612 (Bankr. N.D. Ga. 1991); *Szuch v. Szuch (In re Szuch)*, 117 B.R. 296 (Bankr. N.D. Ohio 1990); *Soroka v. Kornguth (In re Kornguth)*, 111 B.R. 525 (Bankr. W.D. Pa. 1990); *Robbins v. Mizen (In re Mizen)*, 72 B.R. 251 (Bankr. N.D. Ohio 1987); *Cloverdale v. Cloverdale (In re Cloverdale)*, 65 B.R. 126 (Bankr. M.D. Fla. 1986); *Delaine v. Delaine (In re Delaine)*, 56 B.R. 460 (Bankr. N.D. Ala. 1985).

[24] *See, e.g., Richardson v. Edwards*, 127 F.3d 97 (C.A.D.C. 1997); *Horner v. Horner (In re Horner)*, 222 B.R. 918 (S.D. Ga. 1998); *Guerron v. Grijalva (In re Grijalva)*, 72 B.R. 334 (S.D.W.Va. 1987); *Hammermeister v. Hammermeister (In re Hammermeister)*, 270 B.R. 863 (Bankr. S.D. Ohio 2001); *Lipira v. Kaczmarski (In re Kaczmarski)*, 245 B.R. 555 (Bankr. N.D. Ill 2000); *In re Costanza*, 215 B.R. 588 (Bankr. W.D. Mo. 1997); *Blaustein v. Berg (In re Berg)*, 167 B.R. 9 (Bankr. E.D.N.Y. 1994); *Fuda v. D'Atria (In re D'Atria)*, 128 B.R. 71 (Bankr. S.D.N.Y. 1991); *Boehmer v. Boehmer (In re Boemer)*, 119 B.R. 703 (Bankr. E.D. Mo. 1990); *Slingerland v. Slingerland (In re Slingerland)*, 87 B.R. 981 (Bankr. S.D. Ill. 1988); *Hoivic-Olson v. Hoivic (In re Hoivic)*, 79 B.R. 401 (Bankr. W.D. Wis. 1987); *Sharp v. Hysock (In re Hysock)*, 75 B.R. 113 (Bankr. D. Del. 1987); *Tosti v. Tosti (In re Tosti)*, 62 B.R. 131 (Bankr. D. N.J. 1986); *Brock v. Barlow (In re Brock)*, 58 B.R. 797 (Bankr. S.D. Ohio 1986); *Janashak v. Demkow (In re Demkow)*, 8 B.R. 554 (Bankr. Ohio 1981).

imbalance in the relative income of the parties. Here, a minor child is present from Angel's prior marriage. Both Angel and her child need shelter.

There is also a significant imbalance in income between Marcus and Angel. In 2006, Angel had gross income of $29,584.00; Marcus had gross income of $49,012.00.[25] In 2007, Angel's gross income was $26,874.00, while Marcus's was $62,883.00.[26] Angel's income has not increased much since then.[27] Marcus now earns more than $60,000.00 annually. His employer's response to Angel's attempted garnishment, dated June 17, 2010, reflects that he is grossing more than $60,000.00 per year.[28] His Schedule I shows even higher gross income: $6,000.00 a month or $72,000.00 annually.[29] Additionally, Marcus receives pension and medical benefits from the Municipality. Angel does not receive similar benefits as a veterinary technician.

The debtor's obligation to pay does not terminate on the death or remarriage of Angel. While the court did not specifically require installment payments to Angel, it entered a lump sum judgment in her favor with the hope that through garnishment on that judgment, Angel would receive sufficient funds on a monthly basis to pay the second mortgage.

---

[25] Debtor's Ex. C.

[26] Debtor's Ex. D.

[27] Neither party submitted their income tax returns for 2008 and 2009 into evidence. Marcus's statement of financial affairs indicates he had gross income of $61,300.00 in 2008 and $43,980.00 in 2009.

[28] Angel King Obj. to Confirmation (Docket No. 22), Ex. E.

[29] Sched. I, filed Jun. 17, 2010 (Docket No. 1).

Looking at the BAP's *Combs* factors, the debt arose after the state court held an evidentiary hearing "regarding property issues," and after the court entered "Findings of Fact and Conclusions of Law Regarding Property Division."[30] The only evidence regarding negotiations between the parties or their understanding of this debt is the note Marcus signed at the time the loan was taken out, in which he agreed to assume the entire remaining balance if the marriage should dissolve. Marcus unsuccessfully contested the validity of this note during the divorce. The state court awarded Angel a lump sum, rather than periodic payments. However, it did so to account for the debtor's receipt of 65% of the proceeds from the loan and to place a present value on that obligation due to the disparity in interest rates between the second mortgage itself (7.75%) and the judgment entered by the court (3.5%). As discussed above, the relative earning power of the parties is unequal. Marcus earns at least twice as much as Angel, and receives employment benefits that have substantial value.

Angel would not be entitled to alimony *per se* under Alaska law but, in Alaska, alimony is generally awarded only where the financial needs of the parties cannot be met through property division and the alimony award is otherwise just and necessary.[31] Interest accrues on the entire debt to equalize the differing interest rates on the judgment and the second mortgage. The debtor's obligation of payment does not terminate on Angel's death or remarriage.

---

[30] Angel's Claim No. 3, Ex. A at 1.

[31] *Messina v. Messina*, 583 P.2d 804, 805 (Alaska 1978).

13

Although application of the *Shaver* and *Combs* factors leads to mixed results, I find that Marcus's debt to Angel is in the nature of support. A bankruptcy court is to look to the nature of the obligation without regard to whether the debt is designated support or property settlement.[32] The labels used by the state court, e.g., "an evidentiary hearing regarding property issues" and "findings of fact and conclusions of law regarding property division,"[33] are not dispositive. It is clear that the primary concern of the superior court was the preservation of Angel's home. The parties had kept their finances separate during their short marriage and there were no other assets or debts to divide other than the second mortgage.[34] The state court noted that the second mortgage had put Angel at substantial risk of losing her home and that she was struggling to make the mortgage payments. It concluded she needed monthly payments from the debtor in order to retain the home. It also noted that Mr. King was essentially judgment proof.

The state court entered a money judgment in Angel's favor so that she could maximize her chances of retaining the home through garnishment of Marcus's wages. The court hoped to provide a means for insuring that the second mortgage payments could be made through garnishment of the debtor's wages. The superior court even took the extraordinary step of retaining jurisdiction over the case, with annual status reviews, so that a qualified domestic relations order could be entered against the debtor's pension benefits

---

[32] 11 U.S.C. § 101(14A)(B).

[33] Debtor's Ntc. of Obj. to Claim No. 3 (Docket No. 24), Ex. A.

[34] *Id.*, Ex. A at 2.

14

if Angel's garnishment efforts should fail. It felt that, under the "unusual circumstances" of the case, this would be "the only effective way to grant Ms. King appropriate and reliable relief which maximizes her chances of retaining her home."[35]

At the hearing before this court on the debtor's objection to claim, Angel stated that she was still working two and three jobs to try to keep up the second mortgage payments but that she continues to fall behind. Her home could be lost through foreclosure at any time. Preservation of her home provides a necessity of life: shelter for herself and her son. The judgment she received is in the nature of alimony, maintenance or support. It is a domestic support obligation and, thus, a nondischargeable priority claim under 11 U.S.C. § 507(a). The debtor's plan must provide for full payment of her claim under § 1322(a)(2).

Marcus relies on bankruptcy cases from Idaho and Oregon to support his contention that Angel's claim is not a domestic support obligation. In *Hainline v. Neal*,[36] a state court's award of equitable restitution to a wife for her support of her husband debtor during medical school was found not to constitute support. *In re Jennings*[37] involved a debtor's failure to pay credit card obligations under a hold harmless provision in a marital settlement agreement. The court found that the debtor's obligations under the hold harmless

---

[35] *Id.*, Ex. A at 3.

[36] (*In re Neal),* 179 B.R. 234 (Bankr. D. Idaho 1995).

[37] 306 B.R. 672 (Bankr. D. Oregon 2004).

15

agreement were dischargeable. Neither of these cases involved payment of a mortgage obligation, something most federal courts find nondischargeable.[38] They are not persuasive.

Marcus contends that Angel is not entitled to support because they had a short-term marriage. Ordinarily he would be correct. Marriages may come and go, but mortgages are forever. When a husband encumbers a wife's home for his benefit and places that home in jeopardy with a second mortgage, he must be held accountable for such conduct, even in a short-term marriage. The debtor's objection to Claim No. 3 will therefore be overruled.

The court notes that the debtor's pending plan provides for monthly payments of $412.00 for a term of three years, for a total of $14,832.00 in plan payments. Assuming the plan term were stretched to five years, the total plan payments would be just $24,720.00. It appears that the debtor cannot propose a plan which will satisfy the requirements of § 1322(a)(2); he cannot pay the full amount of Angel's claim in full during the life of a plan. The court will, therefore, move *sua sponte* for dismissal of this case.[39]

---

[38] See footnote 21, *infra.*

[39] Conversion to chapter 7 is not a viable option because Marcus is an above-median debtor.

16

An order and judgment will be entered consistent with this memorandum.

DATED:   October 25, 2010.

>BY THE COURT
>
> /s/ Donald MacDonald IV
> DONALD MacDONALD IV
> United States Bankruptcy Judge

Serve:  C. Johansen, Esq.
       Angel King, Pro Se Creditor
       L. Compton, Trustee
       U. S. Trustee
       Claims Register
       Hon. John Suddock, Alaska Superior Court at Anchorage (courtesy copy re
           Case No. 3AN-08-11507 CI)

       10/25/10